UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 15-10007-CR-MARTINEZ

UNITED STATES OF AMERICA,

      Plaintiff,

vs.

STEVAN JOSHUA RODRIGUEZ,

      Defendant.

_____

## REPORT AND RECOMMENDATION

THIS CAUSE is before the Court on Defendant, **Stevan Joshua Rodriguez'** Motion to Suppress Physical Evidence (ECF No. 15), which was referred (ECF No. 16) to United States Magistrate Judge, Lurana S. Snow, for a Report and Recommendation.  The Defendant is charged with possession of a firearm as a convicted felon, possession of heroin with intent to distribute and carrying a firearm during the commission of a drug trafficking crime.  The Defendant seeks to suppress evidence (32 packages of heroin and a firearm) seized from his vehicle at the time of his arrest on May 8, 2015. An evidentiary hearing was conducted on September 11, 2015.

## I. FACTS PRESENTED

Key West Police Department (KWPD) Sergeant Frank Duponty testified that he has been employed by the KWPD for twenty years.  He recently was promoted to the rank of sergeant, after serving as a general case detective and narcotics detective.  Sergeant Duponty stated that on the morning of May 8, 2015, a 911 call was made to the KWPD.  The dispatcher relayed that an anonymous caller had reported a possible drug deal involving three cars in the parking lot of Fausto's Food Palace at the intersection of Bahama and Fleming Streets in Key West, Florida.  The information provided by the caller was that there were three cars in the parking lot: a black Mustang,

a red Camaro and a dark colored car, as well as a white male wearing a white shirt and white shorts who possibly had a gun in his waistband.[1]

Sergeant Duponty advised the disptacher that he would respond to the scene.  The sergeant proceeded down Eaton Street and turned left on Bahama Street.  As he approached the parking lot, he observed a male subject walking down Bahama Street toward Southard Street.  When Sergeant Duponty arrived at the parking lot, he observed a black Mustang with tinted windows parked in the lot, blocking a handcapped parking spot and another spot, and facing the wrong direction.

Sergeant Duponty crossed Fleming Street and turned his car around so it was positioned behind the Mustang in order to see its license tag.  At first, the sergeant observed only one person in the Mustang, a female in the front passenger seat.  As he was relaying the tag number to the dispatcher, the female got out of the car, leaving the door ajar.  Sergeant Duponty then observed a head pop up on the driver's side, coming from behind the front passenger seat.  The Sergeant got out of his car and instructed the female to step away from the Mustang.  Preoccupied with the sudden appearance of the driver and the possibility that he had a gun, Sergeant Duponty did not activate his in-car camera.

Sergeant Duponty instructed the female to tell the driver to get out of the car, and the driver (identified as the Defendant) complied.  The sergeant told the Defendant and the female to step to the back of the Mustang, which they did.  By this time (less than a minute from Sergeant Duponty's arrival), KWPD Officer Jesse Hammers had arrived on the scene. Within 30 seconds of his own arrival, Officer Hammers activated his in-car video camera.[2]  Sergeant Duponty instructed

---

[1] The recorded 911 call was introduced into evidence as Government's Ex. 1.

[2] The video recording produced by Officer Hammer's camera was introduced as Government's Ex. 2.  The events involving Sergeant Duponty during the time before Officer Hammer's arrival (approximately one minute of activity) are not depicted on the video.  Sergeant Duponty explained that the videos produced by the in-car camera go back to one minute before the video is activated, but there is no audio for that minute for privacy reasons.

Officer Hammers to remain with the Defendant and the female (identified as Jennifer Taylor, the Defendant's girlfriend) while Sergeant Duponty checked for other people inside the Mustang.

Sergeant Duponty looked into the Mustang, at which time he noticed a folded piece of paper on the driver's armrest. When the Mustang was cleared, the sergeant walked back to Officer Hammers and the two subjects.  He observed a baggie on the ground about 2 ½ feet away, which he recognized as a package likely containing drugs.  Sergeant Duponty advised the Defendant and Ms. Taylor that they were being detained while he investigated the 911 call information about a possible drug deal involving a gun.  By this time, another KWPD officer had arrived.

Sergeant Duponty testified that the Defendant had both hands on the back of the Mustang and was looking around nervously, causing the sergeant to be concerned that the Defendant was about to flee or attack.  Sergeant Duponty noticed that the Defendant was concealing something in his fist, and then saw part of a car key and part of a baggie protruding from the Defendant's fist. The sergeant decided to handcuff the Defendant, at which time the Defendant tried to break free and then dropped the items from his fists, consisting of a car key, a cigarette lighter and a baggie containing a white substance.  Sergeant Duponty performed a field test on the substance, which indicated that it contained cocaine, and counted the money that had been in the Defendant's front pocket (about $480).  Ms. Taylor told the sergeant that the money was hers, and asked him to give it to her.

The Defendant was arrested on felony charges and placed in a police car.  At that point, Sergeant Duponty knew that the car would have to be towed and he needed to search it prior to the towing.  Ms. Taylor said the car was a rental and she wanted to take it.  The Defendant repeatedly told Sergeant Duponty that he could not search the car.  The sergeant explained that he was arresting the Defendant for possession of narcotics, and that the car was going to be towed and needed to be inventoried.  The Defendant replied that the car was a rental, but when asked about the paperwork, the Defendant said it was at home.

3

Sergeant Duponty used the key to enter the Mustang, which was locked on the driver's side.  While the sergeant was looking for a gun, another officer grabbed the folded paper on the armrest.  Sergeant Duponty put the paper back where it had been, noticing that it contained a brown substance that he suspected to be heroin.  The Defendant told the sergeant not to touch it and that it was his "spiritual stuff."

During the course of the search, Ms. Taylor asked if she could have her phone.  She told Officer Hammers where it was located inside the Mustang and what it looked like.  Using a light, Officer Hammers located the phone and a phone box.  Officer Hammers told Ms. Taylor to show the box to one of the other officers at the scene.  When the box proved to contain more drugs, Ms. Taylor said it was not hers, that it belonged to the Defendant.  The box contained 32 baggies which Sergeant Duponty believed might contain heroin and/or other drugs.  Additionally, a gun was retrieved from the map compartment on the back of the front passenger's seat, where it could have been reached by someone in the driver's seat.

Sergeant Duponty testified that because the Defendant was unable to prove that the car belonged to him or that he had rented it, he could not accept the Defendant's authorization for Ms. Taylor to drive it away.  The car had to be towed because the Defendant had been arrested for a felony and because the car was parked illegally, and was blocking two parking spaces, one of which was a handicapped space.

The applicable KWPD written policy was introduced into evidence as Government's Ex. 3.  Pursuant to KWPD Directive 03.44.02.01 (Government's Ex. 3 at 2):

> A. When the custodial arrest of a person who was inside and in control of a motor vehicle that was either stopped, parked, or in motion, would cause the vehicle to be left unattended, it is the responsibility of the arresting officer to assume control of the vehicle. Subsequent to the arrest, the vehicle shall be towed when
>
> 1. It is used in the commission of a felony. . . .

Also, pursuant to KWPD 03.44.02.06 (Government's Ex. 3 at 3-4):

4

A. In the absence of the vehicle's owner or operator to remedy the situation in a reasonable amount of time, the officer <u>should</u> cause the removal of any vehicle found:

* * * *

   3) Illegally parked in properly designated handicapped spaces . . . .

On cross-examination by defense counsel, Sergeant Duponty testified that the cocaine contained in the baggie dropped by the Defendant contained an amount that might have been for personal use. The sergeant also testified that the information which had been provided to him regarding the anonymous tip did not indicate what activity was going on with respect to any of the three vehicles. Also, the description of the man observed by the tipster did not match the Defendant, who was not a white male and was not wearing white clothing. Sergeant Duponty stated that it was not clear to him who might have had a gun, but he knew that a gun had been mentioned. In retrospect, the man described by the tipster likely was the man Sergeant Duponty had observed walking away from the scene. No one watching the Defendant saw him trying to dispose of a gun from his waistband.

Sergeant Duponty also acknowledged that he did not see the Defendant duck down inside the Mustang, but only saw him as he came back up. As a result, the sergeant could not determine whether the Defendant had ducked down in response to seeing a car approaching. Sergeant Duponty was not using bright or emergency lights.

The sergeant explained that he wanted the Defendant out of the car for security reasons related to the possibility of a gun. After the Defendant exited the Mustang, the driver's door locked, but the passenger door remained ajar. Ms. Taylor initially was restrained, but later was permitted to move around. Sergeant Duponty did a visual search of her person rather than a pat-down and saw no indication that she was concealing anything. The sergeant did not see the baggie dropped on the ground while he was checking the Mustang. Also when checking the Mustang,

Sergeant Duponty saw no indication of drugs other than the folded paper on the armrest, inside of which he could not see.

The sergeant testified that he never asked the Defendant's permission to search the car. Once he decided to arrest the Defendant on a felony cocaine charge, he knew that the car had to be towed pursuant to KWPD policy. Although Sergeant Duponty asked the Defendant about the rental agreement, he would never have allowed Ms. Taylor to drive the car away. He also would not have allowed her to retrieve any property from the car, as the other officers had done.

On redirect examination, Sergeant Duponty testified that when he arrived on scene, the only other vehicles in the parking lot besides the Mustang were two unoccupied parked cars. Accordingly, the only portion of the anonymous tip that he corroborated involved the black Mustang with tinted windows. The sergeant also stated that under Florida law, simple possession of cocaine is a felony.

KWPD Officer Jessie Lee Hammers testified as the Government's second and final witness. Officer Hammers joined the KWPD in July 2014, and his father had served on the force for 23 years. The officer stated that on May 8, 2015, he was dispatched to the intersection of Fleming and Bahama Streets, approaching from the south. Upon arrival, he observed Sergeant Duponty speaking to two individuals at the rear of a black Mustang. Officer Hammers turned on his video camera 20 to 30 seconds after he arrived.

Officer Hammers related that he stood 3 to 4 feet behind the Defendant while Sergeant Duponty cleared the Mustang. He observed the Defendant make a motion with his hand, after which a small clear plastic baggie dropped to the ground. Officer Hammers could not see the Defendant's hands, but saw the motion. Once the Mustang had been cleared, Officer Hammers shined his flashlight on the baggie, which can be seen on the video (Government's Ex. 2). He recognized the package as one likely to contain drugs. Officer Hammers also recognized Ms. Taylor as an employee of an adult entertainment establishment on Fleming Street called "Living Dolls."

6

Officer Hammers stated that when Sergeant Duponty began to handcuff the Defendant, he told the Defendant to put his hands behind has back and open his fists. The Defendant resisted and his resistance increased when the sergeant tried to open the Defendant's hands. Inside the Defendant's fists were a lighter, a key and a small bag containing white powder which appeared to be cocaine.

Officer Hammers testified that Ms. Taylor asked him to retrieve her cell phone, which he did. Ms. Taylor then asked for the phone box, which Officer Hammers allowed her to take as long as she showed it to another officer. The box proved to contain multiple plastic bags similar to the one Officer Hammers had found on the ground. All of the bags, included the one on the ground, field tested positive for heroin. A firearm was located in the rear bifold area of the front passenger's seat.

On cross-examination, Officer Hammers reiterated that the requests for the phone and the box had come from Ms. Taylor. Office Hammers did not know why Ms. Taylor was not arrested; both she and the Defendant denied ownership of the drugs. The officer also stated that when Sergeant Duponty placed the Defendant under arrest, Officer Hammers already had observed the baggie on the ground, which was the reason the Defendant was handcuffed. At that point, the contents of the baggie had not been field tested. The field test was done 20 to 30 minutes after Officer Hammers' arrival, after the Defendant had been placed in the back seat of the police car.

## II. RECOMMENDATIONS OF LAW

The Defendant contends that the firearm and narcotics seized from the Mustang must be suppressed because there was no legal basis for the warrantless search conducted by the police. The Government responds that the search was justified as the inventory search of a lawfully impounded vehicle, as a search incident to arrest and as a search under the automobile exception to the warrant requirement. The Defendant does not challenge the facts as related by Sergeant Duponty and Officer Hammers, and the undersigned notes that their testimony is corroborated by the audio

recording of the 911 call (Government's Ex. 1) and Officer Hammer's in-car video recording (Government's Ex. 2).

The parties also agree on the applicable law. Regarding the requirements of a valid inventory search, the Defendant cites United States v. Williams, 936 F.2d 1243, 1248 (11th Cir. 1991), where the court stated:

> The Supreme Court has indicated that inventory searches are justified only if performed pursuant to explicit and comprehensive procedures. . . . If a search is to be upheld under the inventory search doctrine, the police must first have the authority to impound the vehicle and must then follow the procedures outlined in the policy.

The Defendant argues that in this case, there was no reason for the police to exercise their caretaking function because Ms. Taylor was available to drive the vehicle to the Defendant's home. However, the Government correctly points out that all that is required of the police is that they adhere to their policy. There is no requirement that they first afford a defendant the opportunity to make his own arrangements to move the vehicle. Sammons v. Taylor, 967 F. 2d 1533, 1541 (11th Cir. 1992). "Even if an arrestee's vehicle is not impeding traffic or otherwise presenting a hazard, a law enforcement officer may impound the vehicle, so long as the decision to impound was made on the basis of standard criteria and on the basis of 'something other than suspicion of evidence of criminal activity.'" Id. at 1543 (citation omitted).

In the instant case, the police followed their own written policy of impounding the Mustang because the Defendant was under arrest and the vehicle had been used in the commission of a felony, and also because it was parked in front of a handicapped space. As a result, the inventory search of the Mustang was lawful.   Id.

The Government also argues that the search was permissible as a search incident to arrest, because it was "reasonable to believe the vehicle contain[ed] evidence of the offense of arrest," quoting Arizona v. Gant, 556 U.S. 332, 351 (2009). Additionally, the Government contends that the search was justified under the automobile exception to the warrant requirement because the

8

police had probable cause to believe the operational vehicle to contain evidence of criminal activity, citing United States v. Lindsey, 482 F.2d 1285, 1293 (11th Cir. 2007).

The undersigned agrees that these two doctrines also support the search of the Mustang. Accordingly, the search was lawful and there is no basis to suppress the gun and drugs seized from the vehicle.

### III. CONCLUSION

This Court having considered carefully the pleadings, arguments of counsel, and the applicable case law, it is hereby

RECOMMENDED that Defendant, **Stevan Joshua Rodriguez'** Motion to Suppress Physical Evidence (ECF No. 15) be DENIED.

DONE AND SUBMITTED at Key West, Florida, this 16th day of September, 2015.

LURANA S. SNOW
UNITED STATES MAGISTRATE JUDGE

Copies to:

SAUSA Mark Wilson (KW)
AFPD Stewart Abrams (MIA)